NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion

to request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter,

it cannot be considered the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of Decisions in the Official

Reports advance sheets following final action by the Court.

                                    

               Docket No. 79217--Agenda 3--November 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PERRY OLINGER,

                               Appellant.

                      Opinion filed April 17, 1997.

                                    

     JUSTICE BILANDIC delivered the opinion of the court:

     Following a jury trial in the circuit court of Whiteside

County, the defendant, Perry Olinger, was found guilty of the

murders of three individuals and sentenced to death. This court

affirmed defendant's convictions and death sentence on direct

appeal. People v. Olinger, 112 Ill. 2d 324 (1986). Defendant

subsequently filed a second-amended petition for post-conviction

relief, which the circuit court dismissed without conducting an

evidentiary hearing. He appeals to this court from the dismissal of

his post-conviction petition. 134 Ill. 2d R. 651(a).

                                   FACTS

     During the morning of May 25, 1982, James Adams was found dead

in his home in Rock Falls, Illinois. Later that same morning,

Gordon Stevens and Debra Bushman were found dead in their home in

nearby Sterling, Illinois. After a five-month investigation by

various law enforcement agencies, defendant and a codefendant,

William Duncan, were charged by indictment with the three

homicides, and with armed robbery, armed violence and conspiracy.

Defendant and Duncan were tried simultaneously before the same

jury. The jury found them both guilty as charged. Defendant and

Duncan each waived his right to a jury for sentencing. In separate

sentencing hearings, the circuit court sentenced defendant to death

and Duncan to life imprisonment.

     This court ultimately reversed Duncan's convictions and

remanded his case for a new trial, holding that Duncan's trial

should have been severed from defendant's trial. People v. Duncan,

124 Ill. 2d 400 (1988), on remand from Illinois v. Duncan, 484 U.S.

806, 98 L. Ed. 2d 18, 108 S. Ct. 53 (1987), vacating People v.

Duncan, 115 Ill. 2d 429 (1987). As noted, this court affirmed

defendant's convictions and sentence on direct appeal. This case is

now before us following the circuit court's dismissal of

defendant's post-conviction petition.

                              Trial Evidence

     The evidence presented at defendant's trial is detailed in

this court's opinion on direct appeal. People v. Olinger, 112 Ill.

2d 324 (1986). The evidence showed that Tina Taber discovered the

body of her boyfriend, James Adams, lying on his kitchen floor

surrounded by a large pool of blood and blood spatters at

approximately 10:15 a.m. on May 25, 1982. Taber also found Duncan

asleep on a couch in the adjoining living room. Duncan did not

respond when Taber called him, so Taber shook Duncan awake. Duncan

did not appear to understand when Taber told him that Adams was

hurt. Duncan was wearing the same clothes he had on the night

before, and there was no blood on him. Taber and Duncan waited for

the police to arrive. An autopsy revealed that Adams was the victim

of a deep knife wound to his neck and five blows to the head. The

weapon used to kill Adams was never recovered.

     Duncan testified in his own defense that he had slept through

the attack on Adams. He stated that he had drunk at least 10 beers

between 5 p.m. on May 24 and 3:30 a.m. on May 25, had taken a

substantial amount of cocaine and marijuana between midnight and

5:30 a.m. on May 25, had not slept for three days and had taken a

sinequan capsule around 6 a.m. on May 25. He then fell asleep on

the couch. The next thing he remembered was being awakened by

Taber.

     At approximately 11:30 a.m. on May 25, 1982, a friend of Debra

Bushman's discovered the body of Gordon Stevens in the house that

he shared with Bushman. The friend found the front door ajar,

although it customarily was kept locked. She entered, saw Stevens'

body and called police. Upon arriving at the scene, the police

discovered Debra Bushman's body lying in a hallway. There were no

signs of forced entry into the house. Autopsies revealed that

Stevens and Bushman each died from a single gunshot wound to the

head, inflicted at close range with the same .22 magnum pistol.

     The State's evidence against defendant was as follows. It was

undisputed that defendant knew victims Adams and Stevens. Defendant

told police that his association with Adams and Stevens had been

"like a triangle"; they each helped the others to sell drugs when

they had some available.

     With regard to the Adams homicide, the State presented

evidence that Adams both used and sold drugs extensively. Early in

the morning of May 24, 1982, Adams returned from a trip where he

and the codefendant Duncan purchased a large quantity of drugs.

Adams immediately placed several telephone calls informing

potential buyers that he had cocaine for sale. Testimony of Adams'

customers established that Adams sold cocaine beginning at 9 a.m.

and continuing throughout the day on May 24. They reported seeing

defendant at Adams' house, as well as several other people.

     Defendant told police that he went to Adams' house three

different times on May 24--specifically, from 10 to 11 a.m.;

between 1 to 2 p.m.; and from 11:30 p.m. on May 24 until about 4:30

a.m. on May 25. Defendant stated that, during his second visit, he

obtained some cocaine and used it. During his third visit,

defendant obtained more cocaine from Adams on credit, giving Adams

a high-powered rifle as collateral.

     Other testimony established that, at about 1 a.m. in the

morning of May 25, Adams left his house and went to Randolph

Stralow's house, taking his cocaine and money with him. Duncan, who

was staying with Adams, remained at Adams' house, as did defendant

and his girlfriend, Rhonda Odquist. Defendant and Duncan consumed

cocaine there for several hours. During this time, Duncan called

Adams at Stralow's house four times, asking him when he would

return. According to Duncan and Odquist, defendant and Odquist left

Adams' house at around 5 a.m. Stralow testified that Adams left

Stralow's home with his cocaine and money at about 7 a.m. on May

25. An acquaintance of Adams testified that she saw Adams' van

turning into his driveway at 7:15 a.m. on May 25. As stated, Adams'

body was discovered at 10:15 a.m. on May 25. Defendant's palmprint

was lifted from the stove in the kitchen where Adams' body was

found.

     The State also presented evidence that defendant, who was

unemployed, had a large amount of cash after the murders. Patty

Doyle testified that she saw defendant with a rolled-up "wad" of

bills on the afternoon of May 25. She did not know how much money

was there. A gas station attendant testified that defendant paid

his bill with a single $100 bill one or two days after the murders.

On June 3, four $100 bills were recovered from beneath the floor

mat in defendant's pick-up truck.

     Randolph Stralow testified that Adams left Stralow's home with

his cocaine and $1,800 at about 7 a.m. Stralow stated that he knew

the amount of money Adams had because he had watched him count it

out in stacks of hundreds; Adams mostly had $20 bills, but he

"could have" had some $10 and $100 bills. An investigation of the

Adams crime scene on the morning of May 25 revealed no money or

wallet on Adams or in his house. Tina Taber testified that, three

or four days after finding Adams' body, she found Adams' cocaine

hidden in his garage. Patty Doyle testified that when she saw

defendant one week after the murders, defendant told her that "Jim

[Adams] said all the coke was left at [Stralow's]."

     Defendant's mother testified for the defense that she co-

signed a bank loan for defendant in the amount of $3,431, which

proceeds he received in early May 1982.

     With regard to the murders of Stevens and Bushman, the State

presented evidence that defendant was seen talking to Stevens in a

bar during the early evening hours of May 24, 1982. Dale Ulve

testified that defendant and Stevens invited Ulve to stop by

Stevens' house later that night, telling him that they would have

cocaine available for him to use.

     The .22 magnum pistol used to kill Stevens and Bushman was

never recovered; however, the State linked this weapon to the

burglary of Dennis Burris' farmhouse on May 22, 1982. Burris

testified that several firearms, including a .22 magnum pistol, had

been stolen from his farmhouse. Burris further related that, prior

to the burglary, he had shot and killed a dog with the .22 magnum

pistol. The dog's body was exhumed and, according to the State's

firearms expert, the bullets found in the dog were fired from the

same gun as the bullets found in Stevens and Bushman.

     Three men admitted their participation in the Burris burglary-

-defendant, Darrell Onken and Edward Stalder. Defendant's admission

to his participation in the burglary was presented to the jury

through the testimony of the law enforcement officials to whom he

gave his statement.

     Darrell Onken testified for the State regarding the Burris

burglary. Onken stated that, during the afternoon of May 22, he was

drinking at a local tavern. Defendant introduced him to "Mike,"

whose real name, Onken later learned, was Edward Stalder. Defendant

mentioned that he had no money. The three men decided to commit a

burglary. Ultimately, they drove to the Burris residence, where

Onken acted as a lookout while Stalder and defendant went into the

house. Stalder and defendant returned with a burlap sack. Onken did

not see what was in the sack, did not receive any proceeds from the

burglary and did not know what, if anything, the other two

participants received.

     Defense witnesses testified regarding activity that they

observed at the Stevens/Bushman residence on the morning of May 25.

A neighbor who lived across the street from Stevens and Bushman

testified that he saw a man drive up to the Stevens house and walk

to the door at approximately 9:15 a.m. He watched the man enter the

house, but did not notice him leave. This man had dark hair and was

driving a fairly new, light-colored car. Another neighbor who lived

across the street related that he saw a car pull into the driveway

of the Stevens house at about 9:30 a.m. He saw a man get out of the

car and run toward the house. This man had light-brown, shoulder-

length hair and the car was dark green. The neighbors' descriptions

do not fit defendant, who had red hair and drove a pick-up truck.

     The most significant evidence offered by the State to connect

defendant to the three murders was the testimony of Edward Stalder.

Because Stalder's testimony is central to the first claim addressed

on appeal, we present that testimony in detail. Stalder testified

that, in April of 1982, he left his home in another state and moved

into his friend William Mooney's house in Whiteside County,

Illinois. A man named Kevin Anderson and Mooney's wife were also

living there at the time.

     Stalder met defendant for the first time on May 15, when

defendant visited the Mooney house. Stalder had some cocaine in his

possession, which he shared with defendant. Stalder explained that

he generally consumed his cocaine by shooting it up with a needle.

Later that night, Stalder and defendant discovered that they were

out of needles. In a search for needles, Stalder and defendant

drove to Adams' house in Rock Falls. They were directed to the

Stevens/Bushman residence in Sterling. There, Stalder met Stevens

and Bushman for the first time, and then all four shared Stalder's

cocaine. Defendant ultimately dropped Stalder off at the Mooney

house the next evening, May 16.

     Stalder did not see defendant again until he met him in a

tavern in Morrison, Illinois, during the afternoon of May 22.

There, Stalder was introduced to Onken. Stalder, defendant and

Onken talked about "everybody being short on money and figuring out

some way to get some." According to Stalder, while he and defendant

were alone, defendant asked Stalder to join him in "taking over

control of the drug traffic in the area." Defendant suggested that

he and Stalder steal drugs from "Jim Adams and a Bill" and "make

sure there wasn't [sic] any witnesses left." Stalder understood

"Bill" to be William Duncan. Stalder stated that he declined this

offer.

     Stalder, defendant and Onken proceeded to the Burris

farmhouse. Stalder and defendant burglarized the farmhouse while

Onken stood watch outside. Stalder stated that they stole several

firearms including a .22 magnum pistol, a .38-caliber pistol and

two black-powder pistols. Stalder claimed that he took the .38 and

the two black-powder pistols, but that defendant kept the .22

magnum. As stated above, this .22 magnum pistol was later

determined to be the weapon used to kill Stevens and Bushman.

     Stalder further testified that, later during the night, after

Onken was gone, defendant again tried to convince him to "go in

with him on taking over the drug traffic." Stalder again told

defendant that he was not interested.

     Stalder next related that after defendant dropped him off at

the Mooney house on the evening of May 23, he remained there until

May 25. Stalder stated that he heard about the murders and, two or

three days later, he moved into Bob Edmunds' home in Morrison. He

and Edmunds traveled to Iowa, where Stalder gave the two black-

powder pistols to a person with instructions to sell them or

dispose of them. They then returned to Morrison. On June 8 or 9,

1982, Stalder and Edmunds again traveled to Iowa along with Bill

Mooney and others. The group was pulled over outside of Newton,

Iowa, for a traffic offense. Stalder was arrested for possession of

a weapon. Stalder testified that he was carrying "a .38" and "a .45

with filed serial numbers" at the time of his arrest.

     Stalder acknowledged that he had been convicted of a federal

weapons charge and was presently in federal custody. Stalder also

stated that he was given immunity for burglarizing the Burris

residence in exchange for his testimony.

     On cross-examination, Stalder was asked if he had ever

previously been convicted of any crimes. Stalder testified that he

had been convicted of burglary and drug offenses in Florida and of

a drug offense in Nebraska. He also stated that he had been charged

in Iowa for weapons and drug offenses, and that the charges had

been dropped. Stalder further stated that he had been charged with

a parole violation in Florida, which had been dropped because he

was doing five years in federal custody.

     The jury found both defendant and Duncan guilty of the three

murders and related charges. Separate sentencing proceedings

commenced. Defendant waived his right to a jury for sentencing. The

circuit court determined that defendant was eligible for the death

penalty and, after considering evidence in aggravation and

mitigation, sentenced him to death.

                        Post-Conviction Proceedings

     Defendant's second-amended post-conviction petition, with

accompanying exhibits, was filed on August 19, 1994. The State

filed a motion to dismiss the petition. After briefing and

argument, the circuit court granted the State's motion to dismiss

with respect to all claims of the post-conviction petition, except

one. The post-conviction petition alleged that a juror named Myrna

Brown had written a letter to a local newspaper several years after

defendant's conviction in which she espoused the view that criminal

defendants should be presumed guilty until they prove themselves

innocent. The circuit court allowed a discovery deposition to be

taken of juror Brown to determine whether, at the time of

defendant's trial, she followed her oath as a juror. Following this

deposition, the circuit court ruled that juror Brown had done so.

The court therefore dismissed this last claim of the post-

conviction petition.

     Defendant also filed several discovery motions in the circuit

court during the course of post-conviction proceedings. The circuit

court denied all these requests.

     Defendant's post-conviction petition identifies additional

evidence, which was not presented at his trial. This evidence is

discussed in the analysis portion of the opinion.

                                 ANALYSIS

     We initially note the proper scope of our review. Defendant's

petition for post-conviction relief was filed pursuant to the Post-

Conviction Hearing Act (Act) (725 ILCS 5/122--1 et seq. (West

1994)). To obtain relief under the Act's provisions, a defendant

must establish that a substantial deprivation of his constitutional

rights occurred in his trial or sentencing hearing. 725 ILCS 5/122-

-1 (West 1994).

     A defendant is not entitled to an evidentiary hearing on a

post-conviction petition as a matter of right; rather, an

evidentiary hearing is required only when the allegations of the

petition, supported by the record or accompanying affidavits, make

a substantial showing of a violation of a constitutional right.

People v. Del Vecchio, 129 Ill. 2d 265, 279 (1989). For the purpose

of determining whether to grant an evidentiary hearing, all well-

pleaded facts in the petition and any accompanying affidavits are

taken as true. People v. Brisbon, 164 Ill. 2d 236, 245 (1995).

     With some very narrow exceptions, the judgment of the

reviewing court on a previous appeal is res judicata as to all

issues actually decided, and any issue that could have been

presented, but was not, is waived. People v. Ruiz, 132 Ill. 2d 1,

9 (1989).

I. State's Knowing Use of Perjured Testimony and Related Claim

     Defendant contends that his constitutional right to due

process of law was violated at his jury trial because the State

elicited false testimony from Edward Stalder regarding promises

made to him in return for his testimony against defendant.

Specifically, defendant claims that Stalder was permitted to

testify that he was given immunity only from prosecution for the

Burris burglary in exchange for his testimony, when in fact Stalder

obtained a multijurisdictional deal, which included the dismissal

of a number of other charges pending against him. Defendant

attached items to his post-conviction petition which, he argues,

demonstrate that Stalder testified falsely regarding the extent of

the consideration he received in exchange for his testimony.

     The first item attached to defendant's post-conviction

petition is the signed affidavit of Nick Critelli, an attorney who

represented Stalder. This affidavit, dated August 14, 1994, states

in relevant part:

               "I am Nick Critelli, an attorney at law having been

          admitted to practice in the State of Iowa and the State

          of New York. ***

               On or about the 8th day of July, 1982 I was

          appointed by the United States District Court for the

          Southern District of Iowa to represent one Edward

          Stalder, an individual who was to plead to an indictment

          charging a violation of 18 USC 922(k) and 924(a) and 18

          USC app. 1202(a)(1) before that Court.

               During the representation, I and my associate Mr.

          James Sherburne were informed by the United States

          District Attorney assigned to the case, Mr. Joe Beck that

          Mr. Stalder was a suspect in a burglary in Illinois and

          had information that would assist the Illinois

          authorities in a homicide investigation. Mr. Stalder had

          previously talked with the Illinois authorities but had

          not at that point reached an agreement with them

          regarding his testimony. Mr. Beck and I discussed the

          matter and reached an understanding that if Mr. Stalder

          cooperated with the Illinois authorities, he would

          receive favorable treatment in the pending federal case.

          I do not recall how we received the name of the Illinois

          State's Attorney, Mr. Gary Spencer, if I called Mr.

          Spencer first or if he called us, however we did make

          contact and began negotiations. Our plan was that in

          exchange for testimony in the homicide case, Mr. Stalder

          would receive absolute immunity on the Illinois burglary

          from Mr. Spencer, Mr. Beck would accept a plea to one

          count of the federal indictment and dismiss the other,

          and Florida and Nebraska would dismiss their pending

          actions against Mr. Stalder. Because of the seriousness

          of the homicide case and the materiality of Mr. Stalder's

          anticipated testimony, the various prosecuting

          authorities were understandably co-operative. Florida and

          Nebraska were not interested in continuing their matters

          as long as Mr. Stalder was doing federal time on the

          federal charge. We were able to work out a global

          settlement of all pending charges against Mr. Stalder."

          (Emphasis added.)

The affidavit further relates that the State's Attorney of

Whiteside County traveled to Des Moines, Iowa, and on July 16,

1982, he signed a written agreement with Stalder, giving Stalder

immunity for the Burris burglary in exchange for his cooperation.

The affidavit also states that on July 29, 1982, Stalder entered

into a plea agreement with the federal government in which he pled

guilty to one count of the federal indictment against him and in

exchange the second count of the indictment was dismissed.

Subsequently, authorities in Florida and Nebraska dismissed their

charges against Stalder as well.

     A second item attached to defendant's post-conviction petition

is an investigative report kept by the Illinois Department of Law

Enforcement. According to this report, the State's investigation

into the homicides was ongoing when Stalder was arrested in Newton,

Iowa, in early June of 1982. The report indicates that one of the

weapons that had been stolen from the Burris farmhouse was found in

Stalder's possession. At that time, a separate weapon taken in the

Burris burglary was suspected of being used to murder Stevens and

Bushman. The report states that, on June 27, 1982, Illinois

authorities traveled to Iowa and met with Stalder and his attorney

at the police station, where they interviewed Stalder concerning

the Burris burglary and the homicides. Stalder's attorney told

authorities that his client had important information about some

homicides and would cooperate with them if they would grant, in

writing, to Stalder the following:

               "1. Dismissal of possible burglary warrant in

          Illinois (Burris burglary)

                2. Dismissal of Iowa (Newton P.D.) gun charges (see

          separate report)

                    a. Possession of concealed weapon, 2 counts

                    b. Operating motorcycle without license

                    c. No lights on cycle

                    d. Possibly other drug charges (hashish oil)

               3. Federal charges (ATF)

                    a. Possession of a firearm after being a

               convicted felon

                    b. Interstate transport of a weapon with

               serial number removed (Stalder states he was

               possibly going to cooperate with federal officers

               anyway for consideration on these charges, on a

               separate, non-connecting incident. He, Stalder,

               would do this on a package deal)

               4. Release from probation from Florida (20 years)

          through Nebraska control[.]"

The report concludes with the statement that police authorities

informed Stalder and his attorney that they would contact the

appropriate "police, probation, prosecuting, and federal agencies

to see what, if anything, could be worked out."

     The rule is well-established that the State's knowing use of

perjured testimony to obtain a criminal conviction constitutes a

violation of due process of law. People v. Jimerson, 166 Ill. 2d

211, 223 (1995). A conviction obtained by the knowing use of

perjured testimony must be set aside if there is any reasonable

likelihood that the false testimony could have affected the jury's

verdict. United States v. Bagley, 473 U.S. 667, 678-80, 87 L. Ed.

2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985).

     These same principles obtain where the State, although not

soliciting the false testimony, allows it to go uncorrected when it

appears. Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S.

Ct. 1173 (1959); People v. McKinney, 31 Ill. 2d 246, 251 (1964). It

is equally well established that the above principles apply even

where the witness' false testimony goes only to that witness'

credibility. Napue, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct.

at 1177. This is because the "jury's estimate of the truthfulness

and reliability of a given witness may well be determinative of

guilt or innocence, and it is upon such subtle factors as the

possible interest of the witness in testifying falsely that a

defendant's life or liberty may depend." Napue, 360 U.S. at 269, 3

L. Ed. 2d at 1221, 79 S. Ct. at 1177.

     Applying these principles here, we conclude that defendant is

entitled to an evidentiary hearing on this claim. Defendant charges

that the State elicited testimony from Stalder that he was only

given immunity from prosecution for the Burris burglary in exchange

for his testimony, when in fact the State knew that Stalder had

obtained a multijurisdictional deal which included the dismissal of

a number of other charges pending against him. Defendant asserts

that, despite this knowledge, the State allowed Stalder's false

testimony to go uncorrected, in violation of his right to due

process.

     This claim is supported by the record. The record of

defendant's jury trial discloses that Stalder testified that the

only promise made to him in exchange for his testimony against

defendant was that he was given immunity for burglarizing the

Burris residence. The following colloquy occurred at the conclusion

of Stalder's direct examination:

               "[Q.] *** Mr. Stalder, I would like to know whether

          or not on occasions prior to your appearance in Court

          today you have discussed the same subject matter that you

          have testified about today with members of the law

          enforcement community?

               A. Yes, I have.

               Q. Specifically, I'd like to know whether or not you

          have discussed the nature and the subject matter of your

          testimony today with the State's Attorney of Whiteside

          County, a gentleman named Gary Spencer?

               A. Yes, I have.

               Q. And is it true, sir, that as a result of your

          discussions with him that an agreement has been reached

          between yourself and Mr. Spencer in his role as State's

          Attorney?

               A. Yes, there was.

               Q. I would like you to indicate for the ladies and

          gentlemen what your understanding is of the agreement

          that exists? [sic]

               A. The only agreement that exists is that the

          charges, as far as the burglary at the Burris residence

          are concerned, are to be dropped. That's the only

          agreement.

               THE COURT: Against this witness?

               A. Against me. That's right, sir.

               Q. And in return for the dropping of the charges,

          were you informed as to what would be expected of you?

               A. I was to give a true and factual statement and

          testimony, if necessary--be against any persons that I

          knew that might have had any connection with that same

          burglary and their conversations or whatever." (Emphasis

          added.)

This was the full extent of Stalder's testimony concerning the

consideration he obtained as a result of his cooperation with

Illinois authorities. We find that a fair appraisal of this record

requires the conclusion that Stalder framed his testimony in such

terms as to impart to the jury the message that the only

consideration he received for testifying was immunity from the

Burris burglary. Once Stalder framed his testimony in this manner,

the State was under an obligation to correct any falsity. This case

is therefore distinguishable from People v. Pecoraro, No. 78457,

slip op. at 10-12 (February 6, 1997), where we explained that the

State has an obligation to correct false testimony, not an

obligation "in the first instance to impeach its own witnesses with

all evidence bearing on their credibility."

     In contrast to Stalder's trial testimony, the affidavit of

Stalder's attorney, which we must accept as true for purposes of

deciding whether to grant an evidentiary hearing (Brisbon, 164 Ill.

2d at 245), unambiguously declares that Stalder obtained a

multijurisdictional deal as a direct result of his cooperation with

Illinois authorities concerning this case. The affidavit of

Stalder's attorney states that he reached an understanding with a

United States District Attorney "that if Mr. Stalder cooperated

with the Illinois authorities, he would receive favorable treatment

in [his] pending federal case." Stalder's attorney further averred

that he negotiated with the State's Attorney of Whiteside County on

Stalder's behalf. The affidavit next states: "Our plan was that in

exchange for testimony in the homicide case, Mr. Stalder would

receive absolute immunity on the Illinois burglary from [the

State's Attorney of Whiteside County], [the United States District

Attorney] would accept a plea to one count of the federal

indictment and dismiss the other, and Florida and Nebraska would

dismiss their pending actions against Mr. Stalder. Because of the

seriousness of the homicide case and the materiality of Mr.

Stalder's anticipated testimony, the various prosecuting

authorities were understandably co-operative. *** We were able to

work out a global settlement of all pending charges against Mr.

Stalder." (Emphasis added.) We conclude that the attorney's

affidavit makes a substantial showing that Stalder did in fact

receive a multijurisdictional deal in exchange for his testimony

implicating defendant in the homicides and that Stalder therefore

committed perjury when he testified to the contrary.

     In addition, we are persuaded that defendant has also made a

substantial showing that Illinois authorities knew of this

multijurisdictional deal, but nonetheless allowed Stalder's false

testimony to go uncorrected. In order to establish a violation of

due process, the prosecutor actually trying the case need not have

known that the testimony was false; rather, knowledge on the part

of any representative or agent of the prosecution is enough. People

v. Brown, 169 Ill. 2d 94, 103 (1995) (and cases cited therein);

accord Giglio v. United States, 405 U.S. 150, 31 L. Ed. 2d 104, 92

S. Ct. 763 (1972). Here, Stalder's attorney's affidavit states that

he was in contact with the State's Attorney of Whiteside County

regarding his negotiation of Stalder's multijurisdictional deal,

and that the State's Attorney of Whiteside County then traveled to

Des Moines, Iowa, and consummated his part of the deal on July 16,

1982. The attorney's affidavit is bolstered by the investigative

report kept by the Illinois Department of Law Enforcement, also

attached to defendant's post-conviction petition. This report

indicates that Illinois authorities had knowledge that Stalder was

facing charges in several different jurisdictions and was willing

to cooperate with Illinois authorities regarding their homicide

investigation in exchange for "a package deal." This report

concludes with the statement that Illinois and other police

authorities told Stalder they would contact the prosecuting

agencies to see what could be worked out. We conclude that the

affidavit sufficiently indicates that the prosecutor's office had

knowledge that Stalder received a multijurisdictional deal.

Defendant is therefore entitled to an evidentiary hearing on this

claim.

     The State responds that any failure on its part to correct

Stalder's testimony constitutes harmless error. According to the

State, evidence of a multijurisdictional deal would have been

"merely cumulative" because the jury was informed that Stalder had

received immunity from prosecution for the Burris burglary and that

he had been charged with numerous crimes in the past. The State

thus maintains that defendant is not entitled to an evidentiary

hearing because Stalder's "lack of credibility and potential motive

to fabricate" were already conveyed to the jury.

     A conviction obtained by the knowing use of perjured testimony

must be set aside if there is any reasonable likelihood that the

false testimony could have affected the jury's verdict. Bagley, 473

U.S. at 678-80, 87 L. Ed. 2d at 492, 105 S. Ct. at 3381-82. This

standard is equivalent to the harmless error standard recently

applied by this court in People v. McNeal, No. 78736, slip op. at

12-13 (January 30, 1997), and People v. Jimerson, 166 Ill. 2d 211,

228-29 (1995). See Bagley, 473 U.S. at 679 n.9, 87 L. Ed. 2d at 492

n.9, 105 S. Ct. at 3382 n.9. In considering the particular facts

and circumstances of this case, we are not able to conclude that

evidence that Stalder obtained a multijurisdictional deal in

exchange for his testimony against defendant would not have

affected the jury's verdict. Such information would show that

Stalder had a powerful motive to testify falsely--i.e., his own

self-interest in obtaining the dismissal of several charges pending

against him in a number of jurisdictions. Had the jury been

informed of such information, it may well have concluded that

Stalder was unworthy of belief because he had an overwhelming

incentive to fabricate testimony.

     More importantly, the testimony of Edward Stalder was critical

to the State's case against defendant. The State's evidence traced

the murder weapon of Stevens and Bushman to the Burris burglary.

Three men admitted their participation in this burglary--defendant,

Onken and Stalder. However, Stalder's testimony was the only

evidence placing the murder weapon in defendant's hands. In

addition, Stalder provided the only evidence which attributed a

motive to defendant for the killings. Stalder claimed that

defendant had attempted to recruit him in a plan to take over the

local drug business by stealing drugs from the victim Adams and the

codefendant Duncan, and leave no witnesses. Maintaining Stalder's

credibility was therefore crucial to the State's case against

defendant. Accordingly, our evaluation of the record as a whole

compels us to conclude that any error in this regard may not be

considered harmless. The fact that the jury was apprised of

Stalder's immunity for the Burris burglary and his criminal

convictions does not alter our conclusion. This information did

inform the jury that Stalder had some motive to testify falsely.

Nonetheless, the motive of which the jury was informed pales in

comparison to the motive Stalder actually had if he indeed received

the multijurisdictional deal attested to in his counsel's

affidavit. See People v. Sawyer, 48 Ill. 2d 127 (1971) (evidentiary

hearing ordered where prosecutor failed to disclose prior narcotics

conviction of State's star witness).

     The State also argues that we should find this issue waived

because it could have been raised on direct appeal. We do not agree

that waiver is appropriate here. Initially, we note that neither

the attorney's affidavit on which defendant relies nor the

investigative report were made part of the record on direct appeal.

Also, the record of defendant's trial leaves no doubt that the jury

was under the impression that the only deal received by Stalder for

his testimony was immunity for the Burris burglary. Under these

circumstances, we find that principles of fundamental fairness are

implicated and require a relaxation of the strict waiver rule. See

Jimerson, 166 Ill. 2d at 230 (similarly declining to apply the

waiver rule); People v. Cihlar, 111 Ill. 2d 212, 218 (1986) (same).

     In a related argument, defendant submits that the State, at

defendant's trial, failed to turn over to the defense all evidence

material to Stalder's impeachment as required by Giglio v. United

States, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and

Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194

(1963). These decisions establish that a defendant is deprived of

his constitutional right to due process of law where the

prosecution fails to turn over material impeachment evidence to the

defense. See United States v. Bagley, 473 U.S. 667, 676, 87 L. Ed.

2d 481, 490, 105 S. Ct. 3375, 3380 (1985). Evidence is material in

this context "only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the

proceeding would have been different." Bagley, 473 U.S. at 682, 87

L. Ed. 2d at 494, 105 S. Ct. at 3383. "A `reasonable probability'

is a probability sufficient to undermine confidence in the

outcome." Bagley, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct.

at 3383. We find that this issue is so closely tied to the issue

discussed above, regarding the prosecutor's failure to correct

Stalder's allegedly perjurious testimony, that it too should be

considered at the evidentiary hearing to be held on whether Stalder

received a multijurisdictional deal. Without an evidentiary

hearing, we cannot determine whether defendant's constitutional

right to due process of law has been violated.

                              II. Juror Bias

     Defendant next asserts that his constitutional right to an

impartial jury was violated because a juror at his trial, Myrna

Brown, was biased in favor of conviction and was not able to render

a fair and impartial verdict. He argues that he is entitled to a

new trial or an evidentiary hearing as a result. In support of this

contention, defendant attaches two items to his post-conviction

petition which, he maintains, demonstrate that the juror

deliberately concealed her true feelings concerning the presumption

of innocence in criminal cases during voir dire.

     During voir dire examination before defendant's jury trial in

1983, juror Brown asserted several times that she understood the

presumption of innocence, that she would require the State to prove

defendant guilty beyond a reasonable doubt and that she could

render a fair and impartial verdict. Also, the following colloquy

took place between defendant's trial counsel and the juror:

               "Q. And, would you expect Perry to prove himself

          innocent?

               A. That's your job.

               Q. No. Do you expect me to prove Perry innocent?

               A. If he is, you will.

               Q. Well, do you think Perry has a burden, any burden

          of proof?

               A. No. All he has to do is tell the truth.

               Q. If the defendant doesn't take the stand, will you

          hold that against him?

               A. No. That's his right."

     The first item attached to defendant's post-conviction

petition is a letter that the juror wrote to the editor of a local

newspaper in 1989, nearly six years after defendant's trial. The

letter stated in pertinent part:

               "A person accused of a crime is `innocent until

          proven guilty.' I think this should be changed to read

          `guilty until proven innocent.' The lawyers would have a

          lot more work to do and this should be proven so there

          was absolutely no doubt about the person's innocence."

The second item is an affidavit, allegedly signed by juror Brown in

1991. The affidavit states that, at the time of defendant's trial,

Brown believed that "a person accused of a crime should be

considered guilty until proven innocent" and that "the defendant

Perry Olinger should have proven that he did not commit the crimes

of which he was accused." These items do not entitle defendant to

a new trial or an evidentiary hearing, for the reasons set forth

below.

     Both the United States and Illinois Constitutions guarantee an

accused a jury that is impartial (People v. Henderson, 142 Ill. 2d

258, 291-92 (1990); People v. Holman, 132 Ill. 2d 128, 157 (1989);

see People v. Leger, 149 Ill. 2d 355, 385 (1992)), which means "a

jury capable and willing to decide the case solely on the evidence

before it" (Smith v. Phillips, 455 U.S. 209, 217, 71 L. Ed. 2d 78,

86, 102 S. Ct. 940, 946 (1982)). This court in Pekelder v.

Edgewater Automotive Co., 68 Ill. 2d 136 (1977), promulgated a two-

part standard to be applied in determining whether a defendant is

entitled to a new trial due to false statements made by jurors

during voir dire examination. A new trial is required if the movant

establishes that (1) a juror answered falsely on voir dire and (2)

prejudice resulted therefrom. Pekelder, 68 Ill. 2d at 139; see

People v. Porter, 111 Ill. 2d 386, 403 (1986) (same test applies in

criminal cases); cf. McDonough Power Equipment, Inc. v. Greenwood,

464 U.S. 548, 556, 78 L. Ed. 2d 663, 671, 104 S. Ct. 845, 850

(1984) (similarly holding that, to obtain a new trial, a party must

demonstrate that "a juror failed to answer honestly a material

question on voir dire" and that "a correct response would have

provided a valid basis for a challenge for cause"); State v.

Messelt, 185 Wis. 2d 255, 269, 518 N.W.2d 232, 238 (1994). This

test is an exception to the general rule that jurors may not

impeach their own verdict. Department of Public Works & Buildings

v. Christensen, 25 Ill. 2d 273, 279 (1962); see Gacy v. Welborn,

994 F.2d 305, 313 (7th Cir. 1993).

     Defendant has failed to establish both parts of the test.

Defendant claims that the letter and affidavit reveal that the

juror lied on voir dire regarding the presumption of innocence. We

do not agree. On voir dire, the juror stated that she understood

the presumption of innocence, that she would require the State to

prove defendant guilty beyond a reasonable doubt and that she could

render a fair and impartial verdict. The letter and affidavit, on

the other hand, merely set forth the juror's personal opinions on

how the criminal justice system could be improved. The letter

states that the presumption of innocence "should be" changed, while

the affidavit states that defendant "should have" proven that he

did not commit the crimes of which he was accused. These

viewpoints, expressed several years after the defendant's trial, do

not demonstrate any falsity in the juror's voir dire testimony.

Notably, the juror never asserts that she applied her viewpoints in

defendant's case. Nor does she state that she did not understand

the presumption of innocence, that she did not require the State to

prove defendant guilty beyond a reasonable doubt or that she was

not able to render a fair and impartial verdict. Consequently,

defendant has failed to demonstrate that the juror lied during her

voir dire examination. Having failed to establish that the juror

answered falsely on voir dire, defendant cannot establish the

second part of the test, that prejudice resulted to him from a

falsity. Defendant is therefore not entitled to a new trial or an

evidentiary hearing on this claim.

     We note, moreover, that a discovery deposition of juror Brown

buttresses our denial of this claim. The circuit court ordered that

Brown's discovery deposition be taken to determine whether, at the

time of defendant's trial, she followed her oath as a juror. Both

counsel for defendant and the State fully participated. At the

deposition, Brown testified that she wrote her letter to the editor

solely in reaction to another letter printed in the newspaper a

short time before. She never connected defendant's trial with the

letter, as the trial had occurred many years earlier. When

questioned regarding her views at the time of defendant's trial,

Brown stated that she had no trouble with the principles that the

burden of proof is "purely upon the prosecution" and that defendant

was considered "innocent until proven guilty." As to the affidavit

attached to defendant's post-conviction petition, Brown testified

that she was not familiar with it and did not sign it. Following

this deposition, the circuit court ruled that both Brown's voir

dire testimony and her deposition revealed that she had afforded

defendant his presumption of innocence and had placed the burden of

proof on the State. The circuit court therefore dismissed

defendant's claim of juror bias. The circuit court's ruling is

supported by the record. For the reasons stated, we likewise

conclude that defendant is not entitled to post-conviction relief

on this ground.

                  III. Ineffective Assistance of Counsel

     Defendant raises several claims of ineffective assistance of

counsel. Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674,

104 S. Ct. 2052 (1984), established a stringent, two-prong standard

for evaluating such claims. A defendant must first demonstrate that

his defense counsel's performance was deficient, in that "counsel

made errors so serious that counsel was not functioning as the

`counsel' guaranteed the defendant by the Sixth Amendment."

Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at

2063. As to this prong, a defendant must overcome the strong

presumption that the challenged action or inaction of counsel was

the product of sound trial strategy and not of incompetence. People

v. Barrow, 133 Ill. 2d 226, 247 (1989). Secondly, a defendant must

demonstrate that, but for defense counsel's deficient performance,

the result of the proceeding would have been different. Strickland,

466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both

prongs of the Strickland test must be satisfied before a defendant

can prevail on a claim of ineffective assistance of counsel.

             A. Failure to Call Codefendant Duncan to Testify

     Defendant initially contends that his trial counsel was

ineffective for failing to call codefendant Duncan to testify or to

cross-examine him when he testified in his own defense. Defendant

points to two areas of inquiry which, he maintains, should have

been brought before the jury. Both were statements contained in

discovery materials tendered to defense counsel before trial, but

were not made part of the record on direct appeal. Defendant argues

that the admission of these statements into evidence through

Duncan's testimony would have buttressed his defense and undercut

the testimony of the State's witnesses.

     The first statement was contained in an application for an

eavesdropping device tendered to the circuit court on May 26, 1982,

by a State's Attorney and a detective. The application recited that

police had spoken with Duncan regarding a telephone conversation he

claimed to have had with Kevin Anderson the day before the murders.

According to the application, Duncan stated to police that Anderson

had a drug dispute with both victims Adams and Stevens. Moreover,

Anderson told Duncan that Anderson had a person "there with him for

the purpose of hurting people" and that Anderson and "the unnamed

person were coming to Adams' house the next day in the morning to

straighten the situation out."

     Anderson's purported statement to Duncan is hearsay. Hearsay

evidence is an out-of-court statement offered to prove the truth of

the matter asserted, and it is generally inadmissible due to its

lack of reliability unless it falls within an exception to the

hearsay rule. People v. Lawler, 142 Ill. 2d 548, 557 (1991).

     Defendant submits that Anderson's statement was admissible as

substantive evidence under the statement-against-penal-interest

exception to the hearsay rule, citing Chambers v. Mississippi, 410

U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), and its progeny.

These decisions establish that an out-of-court declaration against

the declarant's penal interest that the declarant committed the

crime, and not the defendant on trial, may be admitted where

justice requires and where there are sufficient indicia of

trustworthiness of such statement. People v. Bowel, 111 Ill. 2d 58,

66 (1986) (and the cases cited therein). The Chambers Court

considered four factors in making this determination: (1) whether

the statement was made spontaneously to a close acquaintance

shortly after the crime occurred; (2) whether the statement was

corroborated by other evidence; (3) whether the statement was self-

incriminating and against the declarant's interest; and (4) whether

there was adequate opportunity for cross-examination of the

declarant. Chambers, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93

S. Ct. at 1048-49. These factors are merely guidelines, however,

and admissibility ultimately depends on whether the statement was

made under circumstances that provide considerable assurance of its

reliability by objective indicia of trustworthiness. Pecoraro, slip

op. at 6.

     The statement at issue here was not made under circumstances

providing a sufficient indicia of its trustworthiness. The only

factor of the Chambers test met was that the statement tended to

incriminate Anderson. None of the other factors were met. First,

the statement was not made to a close acquaintance shortly after

the crime occurred. Not only does the record fail to reveal the

relationship between Duncan and Anderson, but Anderson allegedly

made this statement to Duncan before the homicides. Neither was the

statement corroborated by other evidence. Defendant submits that

the following evidence at his trial is corroborating: that Edward

Stalder moved in with Kevin Anderson and Bill Mooney in April of

1982, and that Stalder had a history of criminal conduct and drug-

related activity. Defendant is suggesting that Stalder was the

"unnamed" person referred to in Anderson's statement. We are

compelled to point out that there is nothing in Anderson's

statement regarding the identity of the unnamed person. Without

more, we may just as easily assume that the unnamed person was

defendant. We thus find that the second factor was not met. The

fourth factor, whether there was adequate opportunity to cross-

examine the declarant, was also not met. Here, there was no

opportunity to cross-examine Anderson because he was not called as

a witness in defendant's case.

     Defendant has not presented any other indicia of reliability

to support the admissibility of Anderson's statement. We conclude

that Anderson's statement is not rendered admissible by the

presence of the third factor alone. See People v. Keene, 169 Ill.

2d 1, 29-30 (1995) (sole presence of this factor did not render

statement admissible). Therefore, the statement does not qualify to

be admitted as substantive evidence under this exception to the

hearsay rule.

     Defendant also argues that Anderson's statement was

substantively admissible under two other exceptions to the hearsay

rule. He asserts that the statement was admissible to show that

Anderson acted in conformance with his statement, citing People v.

Grabbe, 148 Ill. App. 3d 678, 688-89 (1986), and People v. Reddock,

13 Ill. App. 3d 296, 303-05 (1973). Grabbe and Reddock are

distinguishable. The hearsay statements involved in those cases

were made by homicide victims to show that they acted in

conformance with their stated intent. Defendant has cited no case

where this exception was applied in the manner he is suggesting,

and we are aware of none. We therefore conclude that this exception

is not applicable here.

     Defendant last submits that Anderson's statement was

admissible under the residual exception to the hearsay rule

contained in Rule 804(b)(5) of the Federal Rules of Evidence (Fed.

R. Evid. 804(b)(5)). This court has specifically declined to adopt

this exception. People v. Redd, 135 Ill. 2d 252, 313 (1990).

Consequently, this exception is not applicable in defendant's case.

     In conclusion, Anderson's statement was not substantively

admissible at defendant's trial under any exception to the hearsay

rule. As a result, defendant's trial counsel would not have been

able to admit this statement through the testimony of Duncan. This

claim of ineffective assistance of counsel therefore fails because

defendant has shown no deficiency in his counsel's performance.

     We note, moreover, that we agree with the State that there is

no guarantee that Duncan would have relayed Anderson's statement on

the witness stand. But even if Duncan had done so, the jury was not

likely to have given it much weight. Duncan was a codefendant at

defendant's trial. Duncan gave this statement to police a short

time after the murders. The jury could well have concluded that

Duncan was implicating Anderson at that time in an attempt to

deflect suspicion from himself.

     The second statement referred to by defendant was contained in

a police report. The report recited that Merle Merkle told police

that Duncan told her that he saw a glimpse of the killer as he

walked out the door and that this person was not at Adams' house

when Merkle was there. Defendant claims his trial counsel should

have questioned Duncan on whether he made this statement.

     Defendant has not shown that he was prejudiced by his

counsel's failure to question Duncan regarding this alleged

statement. The statement at issue amounts to a prior inconsistent

statement by Duncan. A prior inconsistent statement is admissible

solely for impeachment purposes; it is not admissible as

substantive evidence of the truth of the matter asserted. People v.

Bryant, 94 Ill. 2d 514, 522 (1983). At best, then, this prior

inconsistent statement by Duncan could have been used to impeach

Duncan's trial testimony that he slept through Adams' slaying. This

impeachment of Duncan would not have benefitted defendant. To the

contrary, impeachment of Duncan on this basis would have lent

support to the State's theory that defendant and Duncan conspired

together at Adams' house to murder Adams. Therefore, this claim of

ineffective assistance of counsel was properly dismissed for

failure to meet the prejudice prong of Strickland.

           B. Failure to Investigate and Impeach Edward Stalder

     Defendant contends that his trial counsel was ineffective

because he failed to properly cross-examine Edward Stalder

regarding possible deals given him in return for his testimony.

This claim is related to the first issue addressed in this opinion,

namely, whether the prosecution failed to correct Stalder's

allegedly perjurious testimony regarding the consideration he

obtained for testifying. Defendant points to the affidavit of

Stalder's attorney and to the investigative report kept by the

Illinois Department of Law Enforcement, both discussed in detail

above, and asserts that these materials demonstrate that his trial

counsel made no effort to adequately investigate or review these

matters, or to use this information to impeach Stalder. He argues

that he is entitled to a new trial or an evidentiary hearing on

this claim.

     We do not agree with defendant that his trial counsel's

performance in this regard was so deficient that he "was not

functioning as the `counsel' guaranteed the defendant by the Sixth

Amendment." Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104

S. Ct. at 2064. A review of the record reveals that, on December

17, 1982, prior to defendant's trial, his trial counsel filed a

discovery motion "for disclosure of impeaching information" of the

State's witnesses. Therein, he requested that the State disclose,

inter alia, all information regarding the following:

               "Any and all consideration or promises of

          consideration given to or on behalf of the witness or

          expected or hoped for by the witness. By `consideration'

          defendant refers to absolutely anything, whether

          bargained for or not, which arguably could be of value or

          use to a witness ***, including but not limited to ***

          leniency, favorable treatment or recommendations or other

          assistance with respect to any pending or potential

          criminal, parole, probation, pardon *** or other dispute

          with [the] People or with any other authority ***; and

          anything else which arguably could reveal an interest,

          motive or bias in the witness in favor of the People or

          against the defense or act as an inducement to testify or

          to color testimony."

Counsel supported this request with a 17-page memorandum of law.

The record further reveals that the trial court allowed this

discovery motion on February 28, 1983.

     The investigative report attached to defendant's post-

conviction petition appears to have been tendered to the defense by

the State in response to this discovery request. Defendant

acknowledges that his trial counsel received this report before his

trial. This report indicated that Stalder was willing to cooperate

with Illinois authorities in exchange for a multijurisdictional

deal, but it did not state that Stalder received such a deal.

Defendant argues that his trial counsel should have used this

report to impeach Stalder or should have investigated the matter

further on his own to determine if Stalder had indeed received such

a deal. We do not agree with this assertion. The record shows that

the State was under a court order to disclose any information that

it had regarding Stalder's receipt of a deal. The only information

that the State provided, however, was that Stalder desired a

particular arrangement, not that he was given it. Under the

particular facts and circumstances of this case, we fail to see

what more trial counsel should have done. In our view, trial

counsel was entitled to rely on the State's response to his

discovery request and assume that the State had accurately

disclosed to him all the impeaching information within the

knowledge of the State's agents. The affidavit of Stalder's

attorney makes a substantial showing that the State was not

forthcoming with all of the impeachment information relevant to

Stalder. This affidavit, however, does not suggest that the

performance of defendant's trial counsel was constitutionally

deficient. We therefore reject this claim of ineffective assistance

of counsel.

           C. Failure to Undermine State's Fingerprint Evidence

     Defendant submits that his trial counsel was ineffective

because he failed to pursue the argument that law enforcement

officials did not investigate all possible leads from unidentified

fingerprints lifted from the Adams crime scene. He argues that, had

his trial counsel pursued this strategy of questioning whether

police performed an adequate investigation, counsel could have

raised a reasonable doubt of defendant's guilt.

     Defendant has failed to meet the prejudice prong of the

Strickland test. He merely posits that some of the unidentified

fingerprints "could have belonged to a person *** responsible for

the murder." This pure speculation falls far short of the

demonstration of actual prejudice required by Strickland.

D. Failure to Present Evidence That Other Persons Were at Adams'

                                  House

     Defendant contends that his trial counsel was ineffective

because he failed to present evidence suggesting that other persons

were present at Adams' house around 2:30 to 3 a.m. on the morning

of May 25, 1982. He argues that his trial counsel should have used

this evidence to impeach Duncan's testimony that only Duncan,

defendant and defendant's girlfriend were present at that time.

     In support of this argument, defendant points to two police

reports, which were tendered to the defense prior to trial. One

police report indicates that a neighbor of Adams named David Downey

thought he saw a car in Adams' driveway at about 3 a.m. in the

morning of May 25, but Downey could not remember for sure because

he was "pretty well drunk." The second police report contained an

interview of a man named Joseph Browning. Browning stated that he

saw a gold car outside Adams' house at about 2:30 a.m. on May 25.

Browning, however, also indicated that he met defendant in the

county jail a short time before giving his police interview.

     Initially, we note that defendant has failed to overcome the

strong presumption that his counsel's decision in this regard was

a matter of sound trial strategy. Barrow, 133 Ill. 2d at 247.

Defendant's trial counsel presented an alibi defense for defendant

through the testimony of his girlfriend, Rhonda Odquist. Odquist

testified that no other persons were present at Adams' house after

Adams left at 1 a.m. on May 25, except herself, Duncan and

defendant. If counsel had presented the testimony suggested above,

he would not only have called Duncan's testimony into question, but

Odquist's as well. Counsel cannot be found constitutionally

ineffective for failing to present testimony that would have

undermined defendant's own witness.

     The circuit court dismissed this claim on the ground that no

prejudice resulted to defendant from his trial counsel's decision

not to present Downey or Browning as witnesses. We agree. At best,

their testimony could have established that a car and two other

people were at Adams' house around 2:30 to 3 a.m. on May 25. The

evidence at trial, however, established that Adams was murdered

sometime between 7:15 a.m. and 10:15 a.m. on that day. The result

of the trial would not have been different based on their

testimony.

E. Failure to Object to a Statement the Prosecutor Made in

                            Closing Argument

     Defendant contends that his trial counsel was ineffective

because he failed to object to the prosecutor's misstatement of the

evidence during closing argument. At trial, Dennis Burris testified

for the State that defendant had visited his house sometime in

April 1982 and had seen Burris' gun collection. Burris stated that

defendant commented that he had "a nice collection." As earlier

noted, other evidence established that, on May 22, 1982, defendant,

along with Edward Stalder and another person, burglarized Burris'

house and stole several firearms, one of which was later identified

as the weapon used to kill Stevens and Bushman. In closing

argument, the prosecutor stated:

          "Mr. Burris *** told you *** Perry Olinger was at his

          house *** and saw those nice guns up in that gun case.

          One of the guns he saw, ladies and gentlemen, was the H&R

          Model 649 Magnum .22 pistol, just like this one. Perry

          liked it. He commented on it to Mr. Burris." (Emphasis

          added.)

Defendant asserts that his trial counsel should have objected to

the emphasized portion of this comment because the prosecutor went

far beyond Burris' actual testimony in an effort to tie the murder

weapon more closely to defendant, to his great prejudice.

     This argument is waived because it was apparent from a direct

examination of the record and should have been raised on direct

appeal. Ruiz, 132 Ill. 2d at 9. Defendant maintains, however, that

his appellate counsel was ineffective for failing to raise this

issue on direct appeal. A defendant who contends that appellate

counsel was ineffective for failing to raise a particular issue on

appeal "must show that `the failure to raise that issue was

objectively unreasonable' and that, `but for this failure, his

sentence or conviction would have been reversed.' " People v.

Flores, 153 Ill. 2d 264, 283 (1992), quoting People v. Caballero,

126 Ill. 2d 248, 270 (1989). The circuit court held that defendant

failed to show sufficient prejudice. We agree. Even assuming,

arguendo, that the comment was improper, we are not able to say

that defendant's conviction would have been reversed, but for his

appellate counsel's failure to raise the issue on direct appeal.

This comment by the prosecutor was isolated and the jury was

instructed that closing arguments are not evidence.

     In the alternative, defendant contends that the prosecutor's

comment on the evidence, above, was prosecutorial misconduct so

serious as to constitute a violation of his right to due process of

law. We reject this assertion. The pertinent inquiry for reviewing

such claims is whether the prosecutor's comment " `so infected the

trial with unfairness as to make the resulting conviction a denial

of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 91 L.

Ed. 2d 144, 157, 106 S. Ct. 2464, 2471 (1986), quoting Donnelly v.

De Christoforo, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 437, 94 S. Ct.

1868, 1871 (1974). The comment pointed to here simply does not rise

to that level of unfairness. Cf. Darden, 477 U.S. at 182, 91 L. Ed.

2d at 157-58, 106 S. Ct. at 2472; Williams v. Chrans, 945 F.2d 926,

949-50 (7th Cir. 1991).

                      F. Deficient Cross-Examination

     Defendant charges that his counsel was ineffective for failing

to cross-examine a witness regarding a blood-like substance found

in defendant's truck. Richard Cass, a crime scene technician,

testified for the State that, on June 3, 1982, he examined

defendant's pick-up truck. On cross-examination, defendant's trial

counsel asked Cass to list all the personal items that he retrieved

from the truck. Cass responded in relevant part:

          "Swabbing of blood-like substance from passenger door

          window frame. Swabbing of blood-like substance from

          interior passenger door. Swabbing of blood-like substance

          from steering wheel and driver's door grip. A plastic jar

          of one half gram dietary supplement bearing blood-like

          stain."

Defendant maintains that his counsel should have continued his

cross-examination of Cass in order to destroy any link between the

blood-like stains in his truck and the bloody crime scene of the

Adams homicide. He asserts that this was possible because there is

nothing in the State's discovery materials to suggest that any test

of the blood-like substance was ever conducted.

     Defendant waived this issue by failing to raise it on direct

appeal. Ruiz, 132 Ill. 2d at 9. He contends, however, that his

appellate counsel was ineffective as a result. The circuit court

rejected this claim for lack of prejudice. We must agree, for we

cannot say that but for appellate counsel's failure to raise this

issue on direct appeal, defendant's conviction would have been

reversed. Flores, 153 Ill. 2d at 283.

                   G. Defendant's Exculpatory Statement

     Defendant contends that his trial counsel was ineffective

because he failed to competently argue that the jury should have

been allowed to consider defendant's grand jury testimony that

Edward Stalder, not defendant, retained possession of the .22

magnum pistol used to kill Stevens and Bushman. Defendant submits

that his trial counsel should have argued that this statement was

admissible under the completeness doctrine.

     On direct appeal, defendant's appellate counsel argued that

the circuit court's failure to allow this portion of defendant's

grand jury statement into evidence gave the jury the mistaken

impression that he admitted keeping the murder weapon. This court

found the issue waived because it was not raised at trial. People

v. Olinger, 112 Ill. 2d 324, 338 (1986). Defendant now asserts that

his appellate counsel was ineffective for failing to argue on

direct appeal that his trial counsel was ineffective in his

presentation of this issue to the trial court.

     The circuit court dismissed this claim, ruling that

defendant's grand jury statement would not have been admissible in

any event. We agree. Under the "completion doctrine," when a

portion of a conversation is related by a witness, the opposing

party has a right to bring out the remainder of that conversation

to prevent the trier of fact from being misled. People v. Ward, 154

Ill. 2d 272, 311 (1992). A defendant, however, "has no right to

introduce portions of a statement which are not necessary to enable

the jury to properly evaluate the portions introduced by the

State." Olinger, 112 Ill. 2d at 338.

     Here, the State introduced into evidence the defendant's

statement that he admitted burglarizing the Burris residence along

with Stalder and Onken. Defendant's position is that, in response,

he was entitled to introduce into evidence his exculpatory

statement that Stalder kept the .22 magnum pistol stolen in that

burglary, which pistol was later determined to be the murder

weapon. We are not persuaded that this latter statement was

necessary to prevent the jurors from being misled by the former

statement. Rather, the latter statement would have only served to

place defendant's own exculpatory version of events before the jury

without his having to take the stand and face impeachment. As this

court explained on defendant's direct appeal, a defendant has no

such right. Olinger, 112 Ill. 2d at 337-38. We therefore reject

this claim for lack of prejudice.

                            H. Sentencing Phase

     Defendant next alleges that his trial counsel was ineffective

for failing to investigate and call numerous witnesses in

mitigation at the sentencing phase. He attached to his post-

conviction petition the affidavits of 18 persons who averred that

they would have been willing to testify in defendant's behalf at

sentencing.

     The failure to present mitigating evidence at a capital

sentencing hearing does not in and of itself demonstrate that a

defense attorney was ineffective. People v. Steidl, 142 Ill. 2d

204, 248-49 (1991). Rather, a defendant must show that defense

counsel's failure to investigate and call witnesses fell below an

objective standard of reasonableness under prevailing professional

norms, and that, but for defense counsel's deficient performance,

there is a reasonable probability that the result of the proceeding

would have been different. People v. Perez, 148 Ill. 2d 168, 191,

195 (1992).

     A brief review of defendant's capital sentencing hearing is

necessary for a proper evaluation of this claim. Following the jury

trial, defendant waived his right to a jury for sentencing. A

stipulation was entered that defendant was 35 years of age. The

circuit court determined that defendant was eligible for the death

penalty on two bases: multiple murders (Ill. Rev. Stat. 1983, ch.

38, par. 9--1(b)(3)) and murder in the course of another felony

(Ill. Rev. Stat. 1983, ch. 38, par. 9--1(b)(6)).

     The State presented the following evidence in aggravation. In

1973 defendant was convicted of unlawful possession of dynamite and

sentenced to two to eight years in prison. In 1975 defendant was

convicted of burglary and sentenced to a one- to three-year prison

term. In 1981 defendant was convicted of criminal damage to

property for shooting and killing four of his neighbor's horses

when they ran through his yard. Lastly, David Willman testified

regarding charges that were still pending against defendant at the

time of sentencing. Willman testified that, on May 16, 1982, he and

defendant engaged in a fist fight after Willman refused to lend

defendant money. Defendant cut Willman's thumb with a knife.

Defendant left but reappeared and fired shots at Willman. Willman

and defendant engaged in another fight in which defendant knocked

out three of Willman's teeth by hitting him with a pistol.

Defendant then forced Willman into his pick-up truck, drove to a

bridge and ordered Willman to jump off the bridge. Willman refused.

     In mitigation, defendant presented the testimony of eight

character witnesses, including defendant's mother. These witnesses

variously described defendant as a person who would help someone

out if he could; who was nice; normal; a good worker and helpful;

and a friend. Defendant was also described as "a perfect

gentleman." Moreover, defendant's girlfriend testified that Willman

started the fight with defendant that caused his injuries.

Defendant's mother related that defendant had served four years in

the military and received an honorable discharge.

     The circuit court ruled that defendant's military service was

evidence in mitigation, but that there was not sufficient

mitigating evidence to preclude the death penalty. The circuit

court then sentenced defendant to death.

     Defendant has failed to demonstrate that the result of his

capital sentencing hearing would have been different if his defense

counsel had presented these additional witnesses. As stated, at the

sentencing hearing, defense counsel presented a total of eight

witnesses in mitigation, including defendant's mother. These

witnesses related that defendant was a person who would help

someone out if he could; who was nice; normal; a good worker and

helpful; and a friend. One witness called defendant "a perfect

gentleman." Additional testimony along these lines would have been

merely cumulative and would not have altered the decision of the

sentencing judge. Moreover, defendant, in his post-conviction

petition, has pointed to no allegedly mitigating evidence that

would have changed the outcome of his sentencing hearing. Absent

such a showing, collateral relief is properly denied. Stewart v.

Gramley, 74 F.3d 132, 135-37 (7th Cir. 1996).

                  IV. Post-Conviction Discovery Requests

     During the post-conviction proceedings below, defendant

requested that he be permitted discovery in order to analyze the

following items: fingerprint evidence collected by the State from

the Adams crime scene; the blood-like substance found in his truck;

and the four $100 bills found in his truck. Defendant asserts that,

if permitted discovery of these items, he may be able to place

other possible suspects at the Adams crime scene, show that the

blood-like substance in his truck did not belong to the victim,

Adams, and, finally, show that the four $100 bills were proceeds

from his bank loan. The circuit court denied all these requests.

Defendant alleges reversible error in the circuit court's denial.

     The circuit court has inherent discretionary authority to

order discovery in post-conviction proceedings. People ex rel.

Daley v. Fitzgerald, 123 Ill. 2d 175, 183 (1988). Circuit courts

should exercise this inherent authority with caution, however,

because post-conviction proceedings afford only limited review and

"because there would exist in those proceedings a potential for

abuse of the discovery process." Daley, 123 Ill. 2d at 183.

     The circuit court correctly denied the discovery requests. The

requests amount to a fishing expedition in an attempt to create

some doubt of defendant's guilt. Post-conviction proceedings are

limited to providing a forum for the litigation of constitutional

claims that were not presented in the original proceedings. Daley,

123 Ill. 2d at 182. Defendant's discovery requests go beyond this

limited scope and, as a result, were properly denied.

                                CONCLUSION

     For the reasons stated above, the judgment of the circuit

court is affirmed in part and reversed in part. The circuit court's

rulings are all affirmed, with two exceptions. We reverse the

circuit court's dismissal without an evidentiary hearing of two

claims presented in defendant's post-conviction petition. Defendant

is entitled to an evidentiary hearing on the issue that the State

knowingly used perjured testimony against him at his trial.

Defendant is also entitled to an evidentiary hearing on the related

issue that the State failed to turn over to the defense all

evidence material to Edward Stalder's impeachment. This cause is

therefore remanded to the circuit court for further proceedings.

Affirmed in part and reversed in part;

                                                            cause remanded.